AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Ross Klinger, | ) | Case No. 4:21-mj-71085-MAG |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

FILED
Jun 25 2021
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of   the week of September 28, 2020   in the county of   Alameda   in the
  Northern   District of   California  , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2243(b) | Sexual abuse of a ward |
| | Maximum Penalties:<br>15 years imprisonment, $250,000 fine, three years supervised release, $100 special assessment, fine |

This criminal complaint is based on these facts:

See attached affidavit of FBI Special Agent Katherine Barclay

☑ Continued on the attached sheet.

Approved as to form   /s/ Molly K. Priedeman
  AUSA   Molly K. Priedeman

/s/ Katherine Barclay
*Complainant's signature*

Katherine Barclay
*Printed name and title*

Sworn to before me over the telephone and signed by me pursuant to Fed.R.Crim.P. 4.1 and 4(d)

Date:   June 25, 2021

*Judge's signature*

City and state:   Oakland, CA     Hon. Donna M. Ryu, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT**

I, Katherine Barclay, a Special Agent with the Federal Bureau of Investigation (FBI), having been duly sworn, hereby declare the following:

## I. INTRODUCTION

### A. Purpose of Affidavit

1. This Affidavit is made in support of a Criminal Complaint and Arrest Warrant for ROSS KLINGER (hereafter, "KLINGER"). This affidavit is made in support of a criminal complaint charging KLINGER with Sexual Abuse of a Ward in violation of Title 18, United States Code § 2243(b).

### B. Sources of Information

2. The statements made in this affidavit are based on my experience and training as a Special Agent with the FBI, information provided to me by other law enforcement officers and agents, evidence obtained via subpoenas, search warrants, and from the Federal Bureau of Prisons ("BOP"), which I believe to be reliable, as well as other sources. To the extent this Affidavit discusses statements made by witnesses and/or victims, I have also included examples of information developed independently during the investigation that corroborates many of their statements. The inmate victims and witnesses discussed in this Affidavit have been convicted of one or more felonies, including fraud and other offenses, and were each sentenced to custodial terms with BOP. Because this affidavit is being submitted for the limited purpose of securing an arrest warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause that KLINGER violated Title 18, United States Code § 2243(b). Further, my understanding of the facts may evolve as the investigation continues.

### C. **Agent Background**

3.  I am a Special Agent ("SA") with the FBI, and have been since August 2016. As an FBI Special Agent, I have investigated various federal crimes, including computer crimes, crimes involving fraud, public corruption, and civil rights. As a federal agent, I am authorized to investigate violations of the laws of the United States, and to execute warrants issued under the authority of the United States.

4.  As part of my training, I have learned about a number of investigative techniques including, but not limited to, interviewing targets, subjects and other witnesses, reviewing financial records, reviewing electronic evidence including information from emails and social media websites, and conducting search warrants of electronic devices, residences, email accounts, and other locations. Through my training, experience, and my discussions with other experienced law enforcement officers and agents, I am familiar with the methods of operation used by correctional officers who attempt to engage or engage in sexual relationships with BOP inmates, and how correctional officers and others introduce contraband into federal prisons, and the types of authorized communication allowed by BOP inmates.

5.  I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code. As a federal agent, I am authorized to investigate violations of laws of the United States and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

D. **Applicable Law**

6. The elements of Sexual Abuse of a Ward relevant to this application for a criminal complaint are: (1) the defendant knowingly engaged in a sexual act with a victim; (2) at the time the victim was in official detention at a federal facility; (3) the victim was under the custodial, supervisory, or disciplinary authority of the defendant, and (4) the defendant's actions took place within the special maritime and territorial jurisdiction of the United States or in a federal prison. *See* 18 U.S.C. § 2243(b).

## II. STATEMENT OF PROBABLE CAUSE

A. **Background on FCI Dublin and KLINGER**

7. The BOP Federal Correctional Institute Dublin (hereafter, "FCI Dublin") is an all-female low security federal correctional institution with an adjacent minimum-security satellite camp located in Dublin, California. This facility is located within the Northern District of California (NDCA).

8. Until approximately October 2020, KLINGER was a correctional officer at FCI Dublin. In approximately November 2019, Klinger was promoted to the Recycling Technician position. As the Recycling Technician at FCI Dublin, KLINGER oversaw the work of inmates who participated in the Recycling and Safety Program at the federal correctional institution and the camp. As a correctional officer, KLINGER had disciplinary authority over inmates incarcerated at FCI Dublin, including the inmates that he directly supervised in his capacity as Recycling Technician. KLINGER was required to conduct his work and supervise inmates in accordance with BOP policies and procedures. He was advised, as part of his training, that he could not maintain inappropriate relationships with inmates, which included becoming emotionally, physically, sexually, or financially involved with inmates or former inmates.

BARCLAY AFF. IN SUPPORT OF CRIMINAL COMPL.

3

KLINGER was further advised that he could not show favoritism or give preferential treatment to one inmate or group of inmates over another.

9.   In or around October 2020, KLINGER was transferred to Metropolitan Correction Center (MCC) San Diego, California (hereafter, "MCC San Diego"). He was placed on administrative leave on or about April 15, 2021.

### B.   Initiation of the Investigation

10.   On or about June 9, 2020, an inmate (hereafter Witness 1) at FCI Dublin reported that KLINGER was engaged in sexual relationships with several inmates. Witness 1 also reported to FCI Dublin that KLINGER and another correctional officer had provided contraband and money to multiple inmates and also allowed them to use his personal cell phone to call and text their friends and family and use social media. These alleged activities violate BOP policies and constitute potential violations of federal law. As a result of this report and other information, the Department of Justice Office of the Inspector General ("DOJ OIG") began an investigation, which the FBI later joined.

### C.   KLINGER Engaged in Sexual Conduct with Multiple Inmates

11.   As detailed below, agents have developed evidence demonstrating that KLINGER knowingly had sexual intercourse with at least one inmate while she was incarcerated at FCI Dublin and was under his custodial, supervisory, or disciplinary authority. Further, KLINGER likely engaged in sexual contact with another victim inmate. KLINGER told both inmates that he wanted to father their children, gave them and/or their family members money and/or gifts, and told them he wanted to marry them.

### a. Overview of KLINGER's Conduct Towards Victim 1

12. In May 2020, agents interviewed Victim 1, an inmate at FCI Dublin. Victim 1 stated that she had sexual intercourse with KLINGER approximately five to six times between April 2020 and October 2020.

13. Victim 1 reported that she originally met KLINGER after she was designated to FCI Dublin to serve her custodial term. Victim 1 realized that KLINGER was nicer to her than other inmates and flirted with her. Victim 1 stated that in approximately 2018, KLINGER kissed Victim 1 while they were alone in an office. Victim 1 joined the Recycling crew in approximately 2019. As part of the Recycling crew, one of Victim 1's duties was to walk around the prison to collect the recycling materials. KLINGER would accompany her on the walks.

14. In approximately April 2020, during one of their walks, KLINGER and Victim 1 stopped at FCI Dublin's Safety Warehouse[1] and KLINGER unlocked the warehouse. Once inside the Safety Warehouse, KLINGER performed oral sex on Victim 1 and KLINGER and Victim 1 engaged in sexual intercourse for approximately five minutes.

15. Victim 1 estimated she and KLINGER had sexual intercourse approximately five or six times between approximately April 2020 and approximately October 2020, before he transferred to MCC San Diego. Each time was similar to the first incident, and lasted about five minutes, or less.

16. According to Victim 1, the last time she had sexual intercourse with KLINGER was a few days before he transferred out of FCI Dublin. According to BOP records,

---

[1] The Safety Warehouse is located on FCI's prison facility. It is small warehouse, containing cleaning supplies and other tools. The Safety Warehouse is locked, and inmates do not have keys. KLINGER, however, had access to the Safety Warehouse as part of his duties within BOP.
BARCLAY AFF. IN SUPPORT OF CRIMINAL COMPL.

KLINGER's last day at FCI Dublin was on Friday, October 2, 2020, meaning that the encounter occurred approximately the week of September 28, 2020. The sexual encounter was similar to that of the previous encounters, and included sexual intercourse.

17. Victim 1 believed she was the only inmate that KLINGER was romantically or sexually involved with at FCI Dublin, until Victim 1 started hearing rumors about KLINGER being involved in relationships with other inmates. Victim 1 confronted KLINGER about the rumors and he told her he only flirted with other inmates.

18. According to Victim 1, it was her idea that KLINGER apply for a transfer out of FCI Dublin, because she was concerned he would get in trouble for his misconduct. Victim 1 reported that she and KLINGER stayed in touch after he transferred to MCC San Diego to serve as a correctional officer at that location.

19. After KLINGER's transfer to MCC San Diego, Victim 1 stated that KLINGER used an alias, "Juan Garcia," to correspond via email and video visits with her.[2] BOP records demonstrate that Victim 1 corresponded via email with an individual using the email address "juangarcia19223@gmail.com."[3] Many of the communications between KLINGER and Victim 1 were indicative of a sexual relationship. One example is below:

From: Garcia, Juan (approximately 11/03/2020, 9:21 p.m.) – "*Can you imagine…Just dripping all over. Squirming… baby you have know idea what is in store for you. I mean*

---

[2] Inmates at FCI Dublin are provided with email accounts to correspond with outside parties and these communications may be monitored. Inmates may also use a BOP-provided video-telephonic platform to visit with family, friends, and others.

[3] Google records demonstrate that the account was created on or about September 30, 2020 using an IP address associated with KLINGER's wife's name.

BARCLAY AFF. IN SUPPORT OF CRIMINAL COMPL.

6

*have you seen yourself naked? I'm go eat the shit out of your ass. Literally and figuratively*"

20. Several of their communications also alluded to the fact that KLINGER had engaged in sexual conduct with other inmates. For example, on February 19, 2020, Victim 1 emailed KLINGER: "*yeah I hear you was fuckin on who ever . . . . Speaking of which . . . . Never mind.*" The next day, Victim 1, again alluded to his prior sexual relationships when she emailed, "*im sure.... Thing is you have a bad history and well.... I don't... the minute I said I love you... well I didn't give anyone THE ATTENTION THAT BELONGS TO ONLY YOU!!! Yon on the other hand were a sneaky mutha fucker.... So I have to remind myslef everyday that you changed and that you are proving your love to me every minute.*"

21. Victim 1 also had frequent video visits with KLINGER, using the alias "Juan Garcia." I believe KLINGER used an alias to conceal his relationship with Victim 1, as KLINGER likely knew his name would be familiar to BOP staff given his prior, recent employment at FCI Dublin.

22. In several of these video visits with Victim 1, portions of KLINGER's face are visible and were recognized by agents reviewing the recordings. In addition, two distinct dolls are visible in the videos. The dolls as pictured in the videos are pictured below.



BARCLAY AFF. IN SUPPORT OF CRIMINAL
COMPL.

23. On or about April 13, 2021, the FBI and DOJ OIG executed a search warrant at KLINGER's residence in Riverside, California. Agents seized the dolls pictured above, as well as numerous handwritten letters written by Victim 1. One of the letters, dated December 27, 2020, included the following statement: "*the more I think of it the more I see I wasn't the 1st in the crew that you fucked.*" Agents also seized several journals from KLINGER's residence that Victim 1 made for KLINGER. Victim 1 affirmed these items originally belonged to her and that she gave them to KLINGER. Inside one of these journals, agents discovered a photograph of Victim 1 taken while apparently in-custody.

24. Victim 1 also told agents that KLINGER was in contact with her mother, and that KLINGER gave money to her mother to put on Victim 1's Commissary account.[4] Per BOP policy, correctional officers cannot become financially involved with inmates. Here, I believe KLINGER provided money to Victim 1's mother to conceal his involvement with Victim 1 from BOP.

25. Victim 1 also told agents that KLINGER met her children and visited her mother. Phone records demonstrate that there were approximately five calls and 884 text messages between KLINGER[5] and Victim 1's mother's phone between approximately April 19, 2020 and October 19, 2020.

26. According to Victim 1, she and KLINGER made plans to get married after she was released from prison, and KLINGER told Victim 1 that he wanted to have children with her.

27. Victim 1 also reported that KLINGER visited her mother and Victim 1's children and bought gifts, including a Macbook laptop, for her oldest child. During the search of

---

[4] The Commissary provides a bank type account for inmates' money and for the procurement of articles not issued regularly as part of the institution. Funds deposited by family, friends, or other sources are stored in a commissary account maintained by the institution, in this case FCI Dublin.

[5] Based on phone records, agents determined the KLINGER is the subscriber associated with the telephone number that contacted Victim 1's mother.
BARCLAY AFF. IN SUPPORT OF CRIMINAL COMPL.
[

KLINGER's residence, agents found a paper with the names and birthdays of Victim 1's children.

### b. Overview of KLINGER's Conduct Towards Victim 2

28. On or about April 2, 2021, FBI and DOJ OIG agents interviewed Victim 2, an inmate at FCI Dublin. Victim 2 worked for KLINGER on the Recycling crew for approximately six-months in 2020. During the interview, Victim 2 told agents that she had engaged in sexual intercourse with KLINGER while she was incarcerated at FCI Dublin and assigned to the Recycling crew.

29. Victim 2 reported that in mid-2020, she began developing a "closeness" with KLINGER, and KLINGER told her that he wanted to get to know her better. In an initial interview with agents, Victim 2 denied that she and KLINGER engaged in sexual intercourse at FCI Dublin. However, she later re-initiated the interview and admitted that she did engage in sexual intercourse with KLINGER while she was on the Recycling crew at FCI Dublin.[6] Specifically, she stated that she had sexual intercourse with KLINGER in a Conex box[7] at FCI Dublin, while another inmate[8] acted as a lookout.

30. Based on my training, experience, and participation in this investigation, I know that victim inmates may be reluctant to report misconduct by correctional officers or other inmates due to a fear of retaliation, concerns about being negatively labeled as someone that

---

[6] At the end of the interview Victim 2 stated that she had taken over a dozen sleeping pills, and she was subsequently evaluated by a medic.

[7] Conex boxes are shipping containers that are often used for storage. I understand Victim 2 to be referencing approximately four shipping containers located outside on FCI Dublin property and which were accessible to KLINGER and the inmates that made up the Safety and Recycling teams.

[8] This inmate was interviewed by agents and denied having ever acted as a lookout for KLINGER. As mentioned in Paragraph 30, above, I believe it is possible this inmate was not truthful or forthcoming for any of the reasons discussed above, as well as others.

BARCLAY AFF. IN SUPPORT OF CRIMINAL COMPL.

reports misconduct to authorities (commonly referred to using the slang term of "snitch"), fear of being isolated through placement in the Special Housing Unit ("SHU"), and/or causing a problem that could delay their release date from BOP. Further, it is also common for victims of sexual abuse generally to deny sexual conduct occurred due to shame, embarrassment, denial, or a fear of retribution.

31. Victim 2 also told law enforcement that she and KLINGER kept in touch after she was released to a halfway house in late 2020 and communicated via calls, text message, and Snapchat.[9] Phone records reveal approximately 427 calls or attempted calls and approximately 497 text messages between KLINGER and Victim 2's phone during a roughly one month period during this same time frame.

32. On or about September 28, 2020, the Facility Director of the halfway house where Victim 2 resided confiscated Victim 2's phone for inspection. The search of Victim 2's phone revealed several photographs texted to her phone from KLINGER's phone number in late 2020. One of the photographs (shown on the following page) depicted KLINGER's face and upper body with no shirt on. Victim 2 responded to the photographs sent by KLINGER with photographs of herself wearing her underwear and bra.

///

///

///

///

///

---

[9] Based on my training and experience, I know that Snapchat is a mobile phone application that allows users to share photos, videos, and chat messages.

BARCLAY AFF. IN SUPPORT OF CRIMINAL COMPL.

10



33.     Victim 2's phone also had several messages on the Snapchat application from an individual with the username "Klinger1983ross."[10]  Many of these messages were romantic in nature.  One example is included below.



---

[10] The username "KLINGER1983ROSS" reflects KLINGER's full name, as well as his year of birth. Records indicate that the Snapchat account was accessed on or about October 5, 2020 by an IP address that as of approximately September 30, 2020 was registered to KLINGER's wife.
BARCLAY AFF. IN SUPPORT OF CRIMINAL COMPL.

11

34. Victim 2 also reported that KLINGER visited her at the halfway house and they had sex twice at a nearby hotel.[11] KLINGER told Victim 2 that he wanted to impregnate her and become a father. During that visit, according to Victim 2, KLINGER proposed to Victim 2 with a diamond ring.

35. Records from the Best Western Main Street Inn near Victim 2's halfway house[12] confirm that KLINGER stayed at the hotel over a four-day period in September 2020. A note a Best Western employee made during his visit in the hotel's file stated that KLINGER had been seen with several different women and it looked "a little strange."

36. Victim 2 also stated that in approximately February 2021, KLINGER met with Victim 2's friend and gave her $6,000 and iPhone 12 for Victim 2. Agents found a T-Mobile receipt in KLINGER's house dated February 6, 2021, for the purchase of an iPhone 12, as well as a bank withdrawal receipt for $6,000 dated February 8, 2021.

E. **KLINGER Admits Inappropriate Conduct to Law Enforcement**

37. KLINGER was interviewed by DOJ OIG and FBI agents on or about April 13, 2021. The interview was surreptitiously recorded. During the interview, KLINGER made several inculpatory statements. For example, he made references to his life being over due to mistakes he has made and expressed concern about going to prison and being labeled as a sex offender. He also told agents he had called his father to tell him what was going on and to put his affairs in order.

---

[11] Victim 2 initially denied that they had sexual intercourse during this visit, but in the subsequent interview, admitted the sexual conduct.
[12] The hotel is approximately one mile from the halfway house where Victim 2 was staying.
BARCLAY AFF. IN SUPPORT OF CRIMINAL COMPL.

38. During the interview, KLINGER also admitted that he was in a relationship with Victim 1, but he denied that any sexual conduct had occurred. KLINGER admitted that he had hugged Victim 1, given her a shoulder rub, and played with her hair and given her jewelry. Based on my training and experience, I know criminal offenders will often minimize the scope of their misconduct to try and avoid culpability and/or because evidence makes a complete denial implausible. Here, KLINGER was aware that agents located items within his residence that revealed a relationship with Victim 1.

39. During the interview, KLINGER also admitted that after he was transferred to MCC San Diego, he communicated with Victim 1 using the "Juan Garcia" alias via email and video. He also confirmed that he had met Victim 1's children, and that he had given Victim 1's mother money "six or seven" times to add to Victim 1's commissary account.

40. KLINGER claimed Victim 2 was a "friend." According to KLINGER, he visited Victim 2 while she was at the halfway house. KLINGER admitted he drove to see Victim 2, booked a hotel, and took Victim 2 shopping, but he denied any sexual contact occurred.

41. During the interview, KLINGER also remarked, "sexual misconduct of a ward. You can't come back from that."

### III.   CONCLUSION AND REQUEST FOR SEALING

42. Based upon the above facts, as well as my training and experience, I believe that there is probable cause to believe that on or about the week of September 28, 2020 in the Northern District of California, the Defendant, Ross KLINGER, targeted Victim 1 and committed the following federal offense: Sexual Abuse of a Ward, in violation of Title 18 U.S.C. § 2243(b) – Sexual Abuse of a Ward.

43. I further request that the Court order that all papers in support of this application, including this affidavit, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation, the details of which are neither public nor known to the target or other subjects of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, giving the target an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

Respectfully submitted,

*/s/ Katherine Barclay*
KATHERINE BARCLAY
Special Agent
U.S. Department of Justice
Federal Bureau of Investigation

Sworn to before me over the telephone and signed by me pursuant to Fed.R.Crim.P. 4.1 and 4(d) on this __25th__ day of June 2021.

_____
HONORABLE DONNA M. RYU
United States Magistrate Judge